Case No. 3:18-MC-202

# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA

## IN RE: PRECIOUS OLIPHANT

On Appeal from The
Honorable David S. Cayer, Magistrate Judge

## REPLY BRIEF FOR PRECIOUS OLIPHANT ON APPEAL FROM THE MAGISTRATE JUDGE'S CONTEMPT ORDER

Anthony Martinez
Federal Public Defender for the
 Western District of North Carolina

JP Davis
First Assistant
Federal Public Defender for the
 Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC 28202
(704) 374-0720

Melissa S. Baldwin
Assistant Federal Public Defender
Federal Public Defender for the
 Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC 28202
(704) 374-0720

# Table of Contents

Table of Authorities ................................................... ii

Introduction ......................................................... 1

Argument ............................................................. 1

    I.     Ordinary review applies because Ms. Oliphant, an
          unrepresented courtroom spectator, did not have an
          opportunity to object during the summary proceeding
          and promptly filed a Motion for Reconsideration ................. 1

    II.    Ms. Oliphant's single isolated vulgarity, neither directed
          at the court, nor made during a proceeding, does not support
          a contempt conviction ............................................. 4

    III.   Summary contempt was not necessary and employing it
          without an opportunity for the accused contemnor to
          defend herself was error ........................................... 13

Conclusion ........................................................... 15

# Table of Authorities

**Page(s)**

**Cases**

*Brown v. United States,*
356 U.S. 148 (1958) ................................................................ 14

*Eaton v. City of Tulsa,*
415 U.S. 697 (1974) .........................................................*passim*

*Gonzalez v. Sessions,*
894 F.3d 131 (4th Cir. 2018) ...................................................16

*Gordon v. United States,*
592 F.2d 1215 (1st Cir. 1979) ....................................................7

*Harris v. United States,*
382 U.S. 162 (1965) ...................................................................3

*Hormel v. Helvering,*
312 U.S. 552 (1993) ...................................................................2

*In re Gates,*
600 F.3d 333 (4th Cir. 2010) ................................................2, 3

*In re Little,*
404 U.S. 553 (1972) ...................................................................3

*In re Sealed Case,*
627 F.3d 1235 (D.C. Cir. 2010) ...........................................7, 13

*Little v. Little,*
226 N.C. App. 499 (2013) ........................................................16

*Mayberry v. Pennsylvania,*
400 U.S. 455 (1971) ...................................................................3

*Messer v. Kemp,*
760 F.2d 1080 (11th Cir. 1985) ...............................................14

Case 3:18-mc-00202-GCM   Document 15   Filed 03/27/19   Page 3 of 22

*Rock v. Arkansas,*
483 U.S. 44 (1987) ................................................................ 15

*State v. Brown,*
225 N.C.App. 137 (2013) ....................................................... 16

*State v. Griffin,*
246 N.C. 680 (1957) .............................................................. 16

*State v. Soles,*
90 N.C.App. 606 (1988) ........................................................ 16

*Turner v. Johnson,*
No. 14-CV-00579, 2017 WL 2819039 (C.D. Cal. Mar. 29, 2017) .......................... 14

*U.S. ex rel. Robson v. Malone,*
412 F.2d 848 (7th Cir. 1969) ................................................... 4

*United States v. Giovanelli,*
897 F.2d 1227 (2d Cir. 1990) ................................................. 12

*United States v. Goode,*
545 F. App'x 197 (4th Cir. 2013) ............................................. 2

*United States v. Grant,*
703 F.3d 427 (8th Cir. 2013) ................................................. 2

*United States v. Johnson,*
659 F.2d 415 (1981) ............................................................ 2

*United States v. Lowery,*
733 F.2d 441 (7th Cir. 1984) ................................................ 12

*United States v. Marshall,*
371 F.3d 42 (2d Cir. 2004) ............................................... 8, 11

*United States v. Mathis,*
535 F.2d 1303 (D.C. Cir. 1976) ............................................... 1

*United States v. McGainey,*
37 F.3d 682 (D.C. Cir. 1994) ............................................. 8, 9

iii

*United States v. Muhammad,*
478 F.3d 247 (4th Cir. 2007) ..................................................................... 15

*United States v. Neal,*
101 F.3d 993 (4th Cir. 1996) ..................................................................... 3

*United States v. Oberhellmann,*
946 F.2d 50 (7th Cir. 1991) ..................................................................... 8, 9

*United States v. Ortlieb,*
274 F.3d 871 (5th Cir. 2001) ..................................................................... 8

*United States v. Peoples,*
698 F.3d 185 (4th Cir. 2012) ........................................................... 7, 9, 12, 13

*United States v. Schurring,*
No. 5:15-cr-186, 2016 WL 2654508 (N.D. Ohio May 6, 2016) ............................ 11, 12

*United States v. Snider,*
502 F.2d 645 (4th Cir. 1974) ..................................................................... 4

*United States v. Trudell,*
563 F.2d 889 (8th Cir. 1977) ..................................................................... 6, 7, 11

*United States v. Warlick,*
742 F.2d 113 (4th Cir. 1984) ..................................................................... 9

*United States v. Willett,*
432 F.2d 202 (4th Cir. 1970) ..................................................................... 13

*United States v. Wynne,*
989 F.2d 497, 1993 WL 88135 (4th Cir. 1993) ............................................... 2

*Whitehead v. Cowan,*
263 F.3d 708 (7th Cir 2001) ..................................................................... 14

**Statutes**

18 U.S.C. § 401 ..................................................................... 13

iv

## Other Authorities

Alison Flood, *Shocking Figures: US Academics find dramatic growth of swearing in books*, The Guardian (Aug. 8, 2017), available at
<https://www.theguardian.com/books/2017/aug/08/shocking-figures-us-academics-find-dramatic-growth-of-swearing-in-books> ...................................... 11

Fed. R. Crim. P. 42 ....................................................................................... 16

Fed. R. Crim. P. 51(b) ................................................................................ 1, 2

Gov't Br., *United States v. Goode*,
Case No. 13-4154, Dkt. #30 ......................................................................... 7

Gov't Br., *United States v. Davis*, Case Nos. 02-4929, 02-4930,
2003 WL 23893752 (C.A.4) ......................................................................... 7

# Introduction

Ms. Oliphant was accused, adjudged, and sentenced for contempt in two minutes for shouting "piece of sh*t" in a loud angry tone within hearing distance of the court as she exited the courtroom between hearings. It was a single, isolated breach of decorum by a spectator when no actual proceedings were taking place. Her behavior may have justified a warning, but not a criminal contempt conviction. The Court should reject the government's arguments to the contrary and reverse the Contempt Order.

# Argument

## I. Ordinary review applies because Ms. Oliphant, an unrepresented courtroom spectator, did not have an opportunity to object during the summary proceeding and promptly filed a Motion for Reconsideration.

"If a party does not have an opportunity to object to a ruling or order, the absence of an objection does not later prejudice that party." Fed. R. Crim. P. 51(b). This means that the reviewing court "may consider issues that parties had no opportunity to raise below as if they had been raised…." *United States v. Mathis*, 535 F.2d 1303, 1307 (D.C. Cir. 1976).

Ms. Oliphant had no opportunity to object during the summary contempt hearing. She was an unrepresented spectator accused and adjudicated of being in contempt in two minutes with neither a warning, nor an opportunity to defend

1

herself. The Fourth Circuit has found Rule 51(b) applicable in far less compelling situations. *See, e.g., United States v. Wynne*, 989 F.2d 497, 1993 WL 88135 (4th Cir. 1993) (unpublished) (merits review warranted where district court declined to apply an unobjected to specific offense characteristic and imposed sentence without first providing the government an opportunity to object).

The two cases cited by the government to support plain error review involve a contemnor represented by counsel, *United States v. Goode*, 545 F. App'x 197 (4th Cir. 2013), and an attorney practicing in federal court, *In re Gates*, 600 F.3d 333 (4th Cir. 2010). But, in a contempt proceeding where an unrepresented contemnor was misadvised on his right to counsel and insufficient evidence supported his conviction, the Fourth Circuit applied ordinary review. *See United States v. Johnson*, 659 F.2d 415, 416-20 (1981).

"Orderly rules of procedure do not require sacrifice of the rules of fundamental justice." *Hormel v. Helvering*, 312 U.S. 552, 557 (1993). There was no attempt to get a second bite at the apple or bypass the Magistrate Judge. The day after being appointed, the Federal Defender's Office preserved the objections by filing a Motion to Reconsider (Dkt. #2). *United States v. Grant*, 703 F.3d 427, 435 (8th Cir. 2013) ("when a party cannot make a contemporaneous objection on the record, timely moving for reconsideration preserves an objection").

2

Moreover, applying plain error in this case would contravene Supreme Court precedent repeatedly emphasizing that the summary process is prone to abuse and must be subject to meaningful review. *See Mayberry v. Pennsylvania*, 400 U.S. 455, 464 (1971) (although a judge's contempt power is important and indispensable, "its exercise is a delicate one and care is needed to avoid arbitrary or oppressive conclusions"); *In re Little*, 404 U.S. 553, 555 (1972) (contempt should be sparingly used to address "obstruction to the administration of justice[,]" not vindication to a court's "sensibilities"); *Harris v. United States*, 382 U.S. 162, 164 (1965) (summary criminal contempt is "reserved for exceptional circumstances…We reach that conclusion in light of the concern long demonstrated by both Congress and this Court over the possible abuse of contempt power").

The Court should apply independent review for whether Ms. Oliphant's conduct constituted contempt of court and whether summary procedures were necessary and whether substantial evidence existed to support her contempt conviction. Op. Br. at 6-8.[1]

---

[1] In any event, the Court committed plain error in employing summary contempt procedures and adjudging her conduct as violative of 18 U.S.C. § 401. These arguments rely on settled Fourth Circuit and Supreme Court precedent to show error. *United States v. Neal*, 101 F.3d 993, 998 (4th Cir. 1996) (an error is "clear" or "obvious" "when the settled law of the Supreme Court or this Circuit establishes that an error has occurred" (internal quotations and citation omitted)), and an invalid criminal conviction or erroneous denial of non-summary procedural protections affected her substantial rights. *See In re Gates*, 600 F.3d at 341-42 (erroneous summary contempt conviction affected contemnor's substantial rights).

3

## II.    Ms. Oliphant's single isolated vulgarity, neither directed at the court, nor made during a proceeding, does not support a contempt conviction.

The Supreme Court held that a "single isolated usage of street vernacular, not directed at the judge or any officer of the court, cannot constitutionally support the conviction of criminal contempt." *Eaton v. City of Tulsa*, 415 U.S. 697, 698 (1974). The government urges the Court to exclude Ms. Oliphant from this holding by relying on a narrative without support in the record and proposing an interpretation that would limit *Eaton*'s general proposition only to witnesses. *See generally* Gov't Br. at 8-9. Yet, the government fails to cite a single instance where a court spectator was held in summary contempt. *Id.* at 5-12. [2]

The government relies on *Eaton*'s limitation that the vulgarity not be directed at the court, but this is irrelevant since Ms. Oliphant did not insult the court. *See* Gov't Br. at 6-7, 9. The Magistrate's Contempt Order is one and a half pages long. Order, Dkt. #1. The factual findings consist of one paragraph. *Id.* at 1. They were: (1) Ms. Oliphant sat in the courtroom during Dion Williams' Rule 11 hearing and began to

---

[2] Undersigned counsel could only locate one federal case involving a summary contempt conviction for spectators, *U.S. ex rel. Robson v. Malone*, 412 F.2d 848 (7th Cir. 1969). There, spectators viewing arraignments for people charged with destroying selective service records were held in contempt for refusing to stand when the bailiff so instructed. *Id.* at 849. The Seventh Circuit expressed doubt about what a court can legally expect from spectators versus parties before the court or its officers, and noted the conduct did not cause interruption apart from that attendant with the judge's direction to take them into custody. *Id.* at 850. Accordingly, the court vacated the sentence of confinement, holding that exclusion from the courtroom and being held for 4.5 hours sufficed. *Id.* The defendants apparently did not ask to vacate the contempt conviction itself, and the Seventh Circuit did not address that issue. *Id.* at 849; *but see United States v. Snider*, 502 F.2d 645, 658-59 (4th Cir. 1974) (addressing *Malone* and holding that a litigant could not be held in summary contempt for refusing to stand).

4

leave the courtroom with other spectators at the hearing's conclusion, (2) she shouted "piece of sh*t" in a loud angry tone before reaching the courtroom's doors, and (3) the court was in session and her voice could be heard throughout the courtroom. *Id.* [3]

The government contends that the vulgarity had to be "directed at someone" and thus may have been "directed at … a court official." Gov't Br. at 7 & 9. Even assuming that profanity must be a personal insult rather than a form of catharsis, accepting that the expletive was directed at *someone* does not establish it was directed at the court or its personnel. The insult may have been directed at her boyfriend, Mr. Williams, who had just pled guilty to attempted murder, or at his co-defendant,[4] or even at another spectator. Presumably, had the court perceived itself as being on the receiving end of a vulgar insult, it would have said so in its findings. But here, the Magistrate Judge affirmed both orally and in writing that Ms. Oliphant's misbehavior was not an insult to the Court, but the utterance of an expletive. Dkt. #1 at 1 (Ms. "Oliphant shouted "piece of sh*t!" in a loud angry tone."); Op. Br, Dkt. #11, Exh. B at 2 ("You said an expletive. You said it clearly within the hearing of the court and that constitutes what's called a summary contempt."). "[T]he question is not upon what evidence the trial judge could find petitioner guilty[,] but upon what evidence the

---

[3] Ms. Oliphant's volume need not be particularly loud to be heard throughout the small courtroom, where the exit doors are a mere twenty to thirty feet from the bench.
[4] The factual basis for Mr. Williams' plea agreement states that the co-defendant shot at a postal employee and Mr. Williams aided and abetted the crime by driving him. *United States v. Williams*, Case No. 3:18-CR-117, Dkt. #47.

trial judge did find petitioner guilty." *Eaton*, 415 U.S. at 698. Ms. Oliphant was not held in contempt for profanely insulting the court, she was held in contempt for saying an "expletive…within the hearing of the court."

Next, the government urges *Eaton* be strictly limited to its facts. *See* Gov't Br. at 9 (*Eaton* "addresse[s] only a comment by a witness during his testimony"). The Supreme Court's plain language—a "single isolated usage of street vernacular, not directed at the judge or any officer of the court, cannot constitutionally support the conviction of criminal contempt"—contradicts such an interpretation. It also strains credulity to interpret the Court's pronouncement of a substantive limitation on summary contempt in such a way. Under the government's interpretation, *Eaton* would have affirmed the conviction had the witness simply raised his voice when calling his assailant "chicken-sh*t," and would permit convicting a spectator swindled by a fraudster for uttering "a**hole" after that defendant's sentencing.

Contrary to the government's proposal, the Eighth Circuit indicated that the thrust of *Eaton*'s limitation is the exclusion of the single use of profanity not directed at the court or any of its officers. *See United States v. Trudell*, 563 F.2d 889, 892 (8th Cir. 1977). There, a spectator for a highly publicized murder trial of a Native American disturbed an active trial with loud derogatory comments about the government's

prosecution.[5] In the hallway, deputies asked the spectator to read the court's

"conspicuously posted" Standing Order prohibiting "unseemly or disorderly" conduct

in the courtrooms or its halls. *Id.* at 890-91. The spectator then "shouted profanity at

[the] Deputy" eliciting a quick reprimand, which prompted "more profanity" from the

spectator. *Id.* at 891. The Eighth Circuit, however, refused to affirm the non-summary

contempt conviction based on the profanity. *Id.* at 892 ("Were we faced only with

appellant's indiscreet use of profanity, we would be compelled to examine his

sufficiency claim more closely. But appellant did more."). Instead, it affirmed because

the spectator deliberately and repeatedly refused to obey the deputy's instruction to

move from blocking the jury's entrance to the courtroom, thereby delaying the jury

from entering court. *Id.* at 892-93.

The lack of support for the government's interpretation of *Eaton* is evident

from its authorities, which include neither an instance of a spectator being held in

summary contempt, nor a conviction for a single profanity not directed at the court.

*See* Gov't Br. at 6-10.[6] Ms. Oliphant's "piece of sh*t" remark is within the Supreme

---

[5] He stated that the trial was "railroading the defendant" and "why don't they just give a gun to all the attorneys and let them shoot an Indian." 563 F.2d at 891 n.2.

[6] The government does cite contempt convictions for vulgarity, but they all involved vulgarity directed at the court. *See* Gov't Br., *United States v. Goode*, Case No. 13-4154, Dkt. #30 at 4 (defendant said, "You've been an a**hole since I met you, Your Honor."); *United States v. Peoples*, 698 F.3d 185, 190 (4th Cir. 2012) (litigant did not "merely utter profane words" but "profanely threaten[ed] judicial authority"); *In re Sealed Case*, 627 F.3d 1235, 1236-38 (D.C. Cir. 2010) (defendant exclaimed "F*ck Y'all" at the court); *Gordon v. United States*, 592 F.2d 1215, 1217 & n.1 (1st Cir. 1979) (litigant gave a "vituperous dissertation" that accused the court of engaging in criminal activities and running a "corrupt flim flam kangaroo court"); Gov't Br., *United States v. Davis*, Case Nos. 02-4929, 02-4930, 2003, 2003 WL 23893752 (C.A.4), *5-6 (profane diatribe where the defendant called the judge a bigot

7

Court's rule that a "single isolated usage of street vernacular, not directed at the judge or any officer of the court, cannot constitutionally support the conviction of criminal contempt." *Eaton*, 415 U.S. at 698.

But even if an isolated vulgarity not directed at the court could be contemptuous, Ms. Oliphant's conviction cannot stand because there was no proof her profanity obstructed the administration of justice or she did so intentionally.

Ms. Oliphant's three-word vulgarity when no proceeding was taking place did not obstruct the administration of justice. The government identifies three supposed delays or costs—(1) the Marshal presenting Ms. Oliphant for adjudication, (2) the adjudication delaying the court from moving onto the next case, and (3) the clerk recording the contempt conviction. Gov't Br. at 7. But, these delays or costs are part and parcel of the contempt adjudication and cannot be considered in whether her misbehavior obstructed the administration of justice, because "[t]hat would read the requirement of proving an obstruction of justice out of the law…." *United States v. Oberhellmann*, 946 F.2d 50, 53 (7th Cir. 1991). *Accord United States v. McGainey*, 37 F.3d 682, 686 (D.C. Cir. 1994); *United States v. Ortlieb*, 274 F.3d 871, 876 (5th Cir. 2001).

Contrary to the government's assertion, the Fourth Circuit did not reject *Oberhellmann*'s proposition. Gov't Br. at 7. The Fourth Circuit permits consideration of

---

and told him he should be wearing a Ku Klux Klan robe); *United States v. Marshall*, 371 F.3d 42, 44-45 (2d Cir. 2004) (defendant told judge "kiss my a** and your wife can suck my d*ck").

8

the costs and delays associated with investigating *the harm caused by* misbehavior, not those associated purely with holding the contempt proceeding itself. *United States v. Warlick*, 742 F.2d 113, 116 (4th Cir. 1984). In *Warlick*, an attorney investigated individuals on a venire, including directly contacting venire members and their family. *Id.* at 115. Upon learning of this misbehavior, the court had "to make an immediate investigation into the possibility of jury tampering as to all of the cases for which juries were drawn on July 11, 1983." *Id.* at 116. Later, in *Peoples*, the Fourth Circuit rejected the defendant's argument "to abandon" *Warlick* and found *Oberhellmann*'s proposition irrelevant in that case because there was proof of obstruction apart from the adjudication. *Peoples*, 698 F.3d at 191 (misbehavior caused delay in courtroom clerk disseminating jury certificates, prevented reporter from finishing work associated with that day's proceedings, and security officer had to leave his post and return to the courtroom).

As the D.C. Circuit has acknowledged, there is no conflict between *Oberhellmann*'s proposition that the obstruction element cannot be subsumed by the contempt adjudication and *Warlick*'s consideration of investigative costs or delays. *McGainey*, 37 F.3d at 686. So long as the investigation is "independent of any subsequent contempt proceeding[,]" such as in *Warlick*, there was no need to worry about the element of obstruction being "subsumed by the very proceeding in which it must be proved." *Id.* Quite distinct from *Warlick* and directly contrary to *Oberhellman*'s

9

proposition, the government specifically identifies Ms. Oliphant's adjudication itself as the obstruction. Because the government cannot find any costs or delays to support the Magistrate Judge's finding that Ms. Oliphant's behavior obstructed the administration of justice, her conviction rests on insufficient evidence.

Nor does the record support finding Ms. Oliphant possessed the requisite intent for criminal contempt. The government identifies nothing in the Magistrate's findings to support this element, instead relying on unsupported assertions. First, the government claims that Ms. Oliphant lay in wait during the Rule 11 hearing to deliberately time her obstruction to coincide with when the court was inactive. *See* Gov't Br. at 8 ("[s]he sat through the…Rule 11 hearing" and "calculated to disrupt the courtroom as it moved on to the next matter"). The facts, however, indicate an absence of wrongful intent because, as the government acknowledges, Ms. Oliphant was conscientious of the court's business when active and the indecorous activity occurred only during the moments when spectators were exiting the courtroom prior to the next matter. Even if deliberately pre-planned—an assertion that is preposterously unsupported by the record—this would still evidence an intent to *not* disrupt the business of the Court.

Nor does case law support the government's assertion that any reasonable person would know a loud profanity in court is "wrongful". Gov't Br. at 8. As Justice Powell recognized back in the 1970s, "[l]anguage likely to offend the sensibility of

10

some listeners is now fairly commonplace[,]" and, in light of contemporary standards, an individual may have no reason to believe that an expletive "would be offensive or in any way disruptive of proper courtroom decorum." *Eaton*, 415 U.S. at 700.[7] The government's own authority contradicts its assertion that profanity in court is inherently known to be contemptuous. In *Marshall*, the Second Circuit permitted a summary contempt conviction absent a warning that the misbehavior is contemptuous, where a defendant told the judge "kiss my a** and your wife can suck my d*ck" mid-hearing. *Id.* at 44-45. Quite sensibly, the Second Circuit found that "in cases less egregious…a court should warn an attorney, party, or attendee that further instances of particular behavior will be deemed contemptuous before actually charging the offender with contempt." *Id. See also Trudell*, 563 F.2d at 890-91 (unruly spectator directed to conspicuously posted sign on courtroom etiquette).

Although the government argues that Ms. Oliphant's conduct is far more egregious than that typically punished through summary contempt, its authority suggests otherwise. *See* Gov't Br. at 9-10. For example, in *United States v. Schurring*, No. 5:15-cr-186, 2016 WL 2654508 (N.D. Ohio May 6, 2016), a defense attorney directed profane statements at an Assistant U.S. Attorney presenting argument to the court,

---

[7] The use of profanity in American society has only grown since then. *See* Alison Flood, *Shocking Figures: US Academics find dramatic growth of swearing in books*, The Guardian (Aug. 8, 2017) (books in mid-2000s used "f*ck" 168 times more frequently than books in the early 1950s), available at <https://www.theguardian.com/books/2017/aug/08/shocking-figures-us-academics-find-dramatic-growth-of-swearing-in-books>.

such as "f*cking piece of sh*t[,]" which prompted the AUSA to change his presentation. *Id.* at *1, 4. The court, however, did not find the defense attorney guilty of contempt because a public reprimand sufficed to vindicate the court's authority. *Id.* at 6. And, the purportedly "less egregious" cases cited by the government included: a party threatening a judge, *Peoples*, 698 F.3d at 190; a lawyer repeatedly ignoring warnings not to ask witnesses questions about legal conclusions that falsely implied an erroneous proposition of law, *United States v. Lowery*, 733 F.2d 441, 446 (7th Cir. 1984); and a lawyer held in contempt for willfully violating a court order with a "show of defiance before the jury," prompting yet another delay in the trial as the jury had to retire once again, *United States v. Giovanelli*, 897 F.2d 1227, 1229-30 (2d Cir. 1990). *See* Gov't Br. at 9-10. In other words, every one of these "less serious" examples involved a court participant directly showing *contempt* for the *court*. An officer of the court repeatedly defying court orders or a party threatening a judge are qualitatively different from a spectator using a single expletive.

Because Ms. Oliphant's conduct is not contemptuous under *Eaton* and there is insufficient evidence to find her misbehavior was intentional or obstructed the administration of justice, the Contempt Order must be vacated.

12

### III. Summary contempt was not necessary and employing it without an opportunity for the accused contemnor to defend herself was error.

Summary contempt is "always…regarded with disfavor" and to be "used only to fill the immediate penal vindication of the dignity of the court." *United States v. Willett*, 432 F.2d 202, 205 (4th Cir. 1970).

Ms. Oliphant argued that there was no need for immediate penal vindication justifying summary procedures where the misbehavior lasted mere seconds and no proceeding was occurring, noting that the Fourth Circuit has generally affirmed summary contempt adjudications where the misbehavior occurred during an actual proceeding. Op. Br. at 13-14. The government does not cite any case from this jurisdiction affirming a summary contempt conviction where the misbehavior did not occur during a proceeding. *See* Gov't Br. at 10-12.[8] And, the government's response erroneously equates the standard for imposing contempt liability under 18 U.S.C. § 401 with whether or not summary adjudication is appropriate. *See* Gov't Br. at 11. In *Peoples*, the Fourth Circuit affirmed a contempt conviction because 18 U.S.C. § 401 criminalizes conduct occurring outside an actual proceeding. 698 F.3d at 191-92. But, in doing so, said nothing about use of summary adjudication, since the conviction

---

[8] The government only cites one instance of summary adjudication where the misbehavior occurred in the absence of ongoing proceedings. *In re Sealed Case*, 627 F.3d at 1236 (a defendant shouting "F*ck y'all" at the court immediately after being sentenced to 3 years for violating his supervised release to be served consecutively with his 26 years for committing murder). But there, the appellant challenged only the sufficiency of evidence to support the conviction and not the use of summary procedures. *Id.*

13

involved a non-summary adjudication with a full blown evidentiary hearing and all its attendant due process protections. *Id.* at 188-89, 191.

The government also argues that an isolated use of vulgarity in a courtroom when no proceeding is occurring "represents an open declaration of war on the court's authority" that must result in a criminal record for the spectator to maintain respect for the tribunal. Gov't Br. at 10-11. But this is simply false. Although there is a whole body of law devoted to the remedy for a spectator's emotional outburst during a trial, *see, e.g., Whitehead v. Cowan*, 263 F.3d 708 (7th Cir 2001) (victim's mother crying and shouting to the defendant "why did you kill my daughter" was not grounds for habeas relief); *Messer v. Kemp*, 760 F.2d 1080, 1087-88 (11th Cir. 1985) (bereaved father made emotional outburst during difficult testimony); *Turner v. Johnson*, No. 14-CV-00579, 2017 WL 2819039, at *8 (C.D. Cal. Mar. 29, 2017) (spectator excluded from courtroom following his emotional outburst in homicide trial), there is scant precedent for holding spectators in contempt. Cases involve live controversies, often with emotionally charged events, and those who attend often have a personal connection to the case or its participants. Sometimes a spectator has an emotional outburst; this is a fact of life in courtrooms, not an extraordinary affront necessitating summary criminal adjudication. Summary contempt is limited to addressing "obstruction[s] to the administration of justice[,]" not punishing "offenses to [the court's] sensibilities." *Brown v. United States*, 356 U.S. 148, 153 (1958).

14

And even if summary adjudication was necessary, Ms. Oliphant nonetheless should have been given an opportunity to defend against the contempt accusation. *See* Op. Br. at 14-15. The government offers no substantive response to this issue, only pointing to Ms. Oliphant's opportunity to allocute after the conviction had already been imposed. *See* Gov't Br. at 11-12. But allocution and the opportunity to defend onself are not interchangeable. The ability to present a defense is a fundamental constitutional right that provides an accused the opportunity to refute an accusation with her own version of events in her own words, *Rock v. Arkansas*, 483 U.S. 44, 52-53 (1987), whereas allocution is a statutory right to try and persuade the judge to impose a lenient sentence, *United States v. Muhammad*, 478 F.3d 247, 249-50 (4th Cir. 2007). Ms. Oliphant is not arguing for the full panoply of a defendant's rights, but does contend that it was error to not provide *some* opportunity to defend herself. Op. Br. at 14-15.

Because employing summary contempt without some opportunity for the contemnor to defend against the accusation was error, the Contempt Order should be reversed and remanded.

## Conclusion

The Contempt Order should be vacated because Ms. Oliphant's conduct did not constitute criminal contempt. In the alternative, the contempt order should be

vacated and a new hearing should be held where Ms. Oliphant is either provided an

opportunity to argue that her utterance did not constitute contempt or provided a

non-summary hearing under Rule 42(a).[9]

Date: March 27, 2019


Respectfully submitted,

Anthony Martinez
Federal Public Defender for the
Western District of North Carolina

/s/Melissa S. Baldwin
Melissa S. Baldwin
MA Bar #690012
JP Davis, First Assistant
Attorneys for Precious Oliphant
Federal Public Defender
129 W. Trade St., Suite 300
Charlotte, NC 28202
(704) 374-0720
Melissa_Baldwin@fd.org

---

[9] The government claims that Ms. Oliphant's prayer for judgment continued is a criminal conviction. Gov't Br. at 2 n.1. Under North Carolina law, when a court enters a prayer for judgment continued, "there is no judgment—only a motion or prayer by the prosecuting officer for judgment." *State v. Griffin*, 246 N.C. 680, 683 (1957). It cannot serve as a prior conviction at sentencing, *State v. Soles*, 90 N.C.App. 606, 607 (1988), it cannot be appealed, *State v. Brown*, 225 N.C.App. 137, 144 (2013), and it is error to use such a disposition to conclude the defendant was guilty of the crime, *see Little v. Little*, 226 N.C. App. 499, 503-05 (2013) (court erred in hearing on whether to issue a protective order by taking judicial notice of criminal file in an assault case where a prayer for judgment continued was entered to conclude that the defendant had been found guilty). And, such a conviction may not be considered a conviction under federal law. *See, e.g., Gonzalez v. Sessions*, 894 F.3d 131, 142-43 (4th Cir. 2018) (prayer for judgment continued was not a "conviction" under a federal immigration statute).

16